IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| ALEXANDRINA ATANASSOVA and DAVID PENDERGAST, individually and as parents and natural guardians of S.P., a minor, | ) ) ) ) ) | Civil Action No. __2:20-cv-1728-RMG |
| Plaintiffs, | ) ) | **COMPLAINT** <br> **JURY TRIAL DEMANDED** |
| vs. | ) ) | |
| GENERAL MOTORS LLC, | ) ) | |
| Defendant. | ) ) ) | |

COME NOW PLAINTIFFS, ALEXANDRINA ATANASSOVA and DAVID PENDERGAST, individually and as parents and natural guardians of S.P., a minor, by and through their undersigned counsel of record and pursuant to the *Federal Rules of Civil Procedure,* and file this Complaint for damages against Defendant GENERAL MOTORS LLC ("GM"), showing the Court as follows:

## I.

## NATURE OF THE ACTION

1.      This case arises out of serious, permanent, life-scarring personal injuries sustained by S.P., a minor, and her parents, Alexandrina Atanassova and David Pendergast, in a motor vehicle fire (the "Incident") caused by a defective fuel system and components in GM's 2007 Chevrolet Silverado pickup truck (the "Subject Vehicle"). The motor vehicle fire and Plaintiffs' injuries occurred on June 27, 2018, as the Pendergast family was traveling on Interstate 95 in Clarendon County, South Carolina.

2.      Plaintiffs brings this automotive products liability action for their damages

21

sustained, including, but not limited to, medical expenses, pain and suffering, disfigurement and scarring, physical impairment, loss of earning capacity, and loss of enjoyment of life.

3.       Prior to the June 27, 2018 motor vehicle fire, GM placed the Subject 2007 Chevrolet Silverado, including the vehicle's defective fuel system and components, into the stream of commerce with the expectation that they would be purchased by consumers in the United States, generally and in the State of South Carolina.

4.       This products liability action includes claims for strict products liability, general negligence, and failure to warn. The claims asserted herein arise from the design, selection, inspection, testing, manufacture, assembly, equipping, marketing, distribution, delivery, and sale of a defective and unreasonably dangerous vehicle. Defendant was aware, at all times, of its actions and acted with careless and flagrant disregard for the safety and welfare of drivers who they knew would purchase its vehicles.

## II.

## THE PARTIES

5.       At all times relevant, Plaintiff David Pendergast was and is a citizen of the State of South Carolina, residing in Dorchester County, South Carolina.

6.       At all times relevant, Plaintiff Alexandrina Atanassova was and is a citizen of the State of South Carolina, residing in Dorchester County, South Carolina.

7.       Plaintiffs David Pendergast and Alexandrina Atanassova are the parents and natural guardians of Minor Plaintiff S.P.

8.       At all times relevant, Minor Plaintiff S.P. was and is a citizen of the State of South Carolina, residing in Dorchester County, South Carolina.

9.       Defendant GM is a for-profit company which has become one of the largest

automobile manufacturers in the world. Defendant GM is a Delaware limited liability company with its principal place of business in the State of Michigan. Defendant GM may be served with civil process through its registered agent for service, Corporation Service Company, 1703 Laurel St., Columbia, South Carolina 29201.

10.    In 2009, GM acquired substantially all of the assets and assumed liabilities of General Motors Corporation ("Old GM") by way of a Section 363 sale under Chapter 11 of the Bankruptcy Code. Defendant GM assumed specific liabilities of Old GM, which filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in 2009. Pursuant to the Purchase Agreement and other orders of the Bankruptcy Court, Defendant GM purchased the assets of Old GM and hired many, if not most, of Old GM's employees including, on information and belief, most of the same senior-level management, officers, and directors. GM also acquired Old GM's designs, tools, inventory, books, records, and its key contracts, among other essential assets.

11.    Under the Purchase Agreement, GM assumed "all Liabilities to third parties for death, personal injury, or other injury to Persons or damage to property caused by motor vehicles designed for operation on public roadways or by the component parts of such motor vehicles and, in each case, manufactured, sold or delivered by [Old GM] . . . which arise directly out of accidents or incidents first occurring on or after the Closing Date and arising from such motor vehicles' operation or performance."[1]

12.    Because GM assumed Old GM's liabilities with respect to injuries caused by motor vehicles or component parts of such motor vehicles manufactured, sold, or delivered by Old GM and arising from accidents or incidents occurring after the 2009 Closing Date of the Purchase Agreement, references to "GM" mean and include both General Motors LLC and General Motors

---

[1] First Amendment to Amended and Restated Master Sale and Purchase Agreement, § 2(b), dated as of June 30, 2009.

Corporation.

## III.

## JURISDICTION AND VENUE

### A.    Subject matter jurisdiction

13.    This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) based on complete diversity of citizenship between Plaintiffs and Defendant. Plaintiffs are citizens of the State of South Carolina. Defendant is a limited liability company and is incorporated under the laws of Delaware and has its principal place of business in Michigan. The amount in controversy exceeds $75,000, exclusive of interest and costs.

### B.    Personal jurisdiction

14.    This Court has personal jurisdiction over Defendant GM because the exercise of jurisdiction comports with South Carolina's long-arm statute and constitutional due process since South Carolina's long-arm statute is coextensive with the constitutional limitations imposed by the Due Process Clauses of the Fifth and Fourteenth Amendments to the U.S. Constitution. The exercise of jurisdiction over GM in this case by the State of South Carolina comports with due process because GM has the requisite minimum contacts with South Carolina such that having to defend a lawsuit in South Carolina will not offend traditional notions of fair play and substantial justice. In all, GM's contacts with the State of South Carolina are such that it is foreseeable that GM could reasonably anticipate being hailed into court in South Carolina.

15.    The requisite minimum contacts may be established in two ways. First, "general jurisdiction" exists where the defendant has "continuous and systematic" contacts with the forum state such that exercising personal jurisdiction is appropriate even if the cause of action does not arise out of those contacts. Second, "specific jurisdiction" exists where the cause of action is

*related to or arises out of* the defendant's activities within the forum state. In such cases, jurisdiction is proper where the contacts proximately result from actions by the defendant itself that create a substantial connection with the forum State.

### 1.    General jurisdiction

16.    This Court has general jurisdiction over GM because at all times material hereto, GM conducted business in South Carolina and maintained sufficient continuous and systematic contacts with South Carolina such that the exercise of jurisdiction over GM would not offend traditional notions of fair play and substantial justice.

### 2.    Specific jurisdiction

17.    Even assuming that GM's contacts with South Carolina may not support general jurisdiction (which Plaintiffs deny), its contacts are sufficient to meet the less stringent standard for specific jurisdiction because they are sufficiently related to Plaintiffs' claims. Consequently, specific jurisdiction calls for a two-step inquiry: (a) whether the plaintiff has shown that the defendant has minimum contacts with the forum state; and, if so, (b) whether the defendant has presented a compelling case that the presence of some other considerations would render jurisdiction unreasonable

18.    Further, a non-resident defendant may be subject to personal jurisdiction under the "stream of commerce theory" if that defendant placed its product into the stream of commerce with the expectation that they would be purchased in the forum state and the defendant engaged in additional conduct directed toward the forum state. Such additional conduct may include, but is not limited to: (1) designing the product for the market in the forum State; (2) advertising in the forum State; (3) establishing channels for providing regular advice to customers in the forum State; or (4) marketing the product through a distributor who has agreed to serve as a sales agent in the

forum State.

19.     At all times relevant herein, Defendant GM was authorized to conduct business in South Carolina, conducted substantial and continuing business in South Carolina, and derived substantial economic profits from South Carolina through the sale of motor vehicles as enumerated herein. Plaintiffs' claims arise out of the use of a defective GM Chevrolet Silverado pickup truck in South Carolina, which is the same type of vehicle, among others, that GM markets and sells to distributors and others in South Carolina. Therefore, personal jurisdiction is proper under the stream of commerce analysis and under South Carolina Code § 36-2-802 and South Carolina Code § 36-2-803.

### a.    Minimum contacts

20.     The minimum contacts test for specific jurisdiction encompasses two distinct requirements: (i) that the defendant must have purposefully directed its activities at residents of the forum state, and (ii) that the plaintiff's injuries must be *related to or arise out of* the defendant's forum-related activities.

### i.    Purposeful direction requirement

21.     Where the defendant deliberately has engaged in significant activities within a State, it manifestly has availed itself of the privilege of conducting business there. In that case, it is presumptively not unreasonable to require the defendant to submit to the burdens of litigation in that forum.

22.     GM has, at all material times relevant to this case, purposefully directed its conduct toward South Carolina by, among other means:

(1)     designing its vehicles for the market in South Carolina;

(2)     advertising in South Carolina;

(3)     establishing channels for providing regular advice to customers in South Carolina;

(4)     marketing its vehicles through a distributor who has agreed to serve as a sales agent in South Carolina;

(5)     advertising and promoting its vehicles through media that target South Carolina consumers (among others) and/or through channels that would be expected to reach South Carolina consumers;

(6)      designing, developing, manufacturing, testing, marketing, distributing, and/or selling vehicles for the market in South Carolina;

(7)     placing into the stream of commerce the Subject Vehicle with the knowledge that it could reach South Carolina;

(8)     placing into the stream of commerce the Subject Vehicle that was involved in an accident in South Carolina in which Plaintiffs, who are South Carolina residents, were injured;

(9)     placing into the stream of commerce GM vehicles with the clear understanding that its vehicles will find their way to South Carolina;

(10)    marketing the Subject Vehicle and other vehicles for sale via television, radio, and print advertising in South Carolina;

(11)    creating and maintaining a website (https://www.gm.com) to promote business goodwill with consumers in the United States, including consumers in South Carolina;

(12)    creating and maintaining a "dealer locator" function on the https://www.chevrolet.com/dealer-locator website that directs South

Carolina consumers to GM dealerships located in South Carolina based on city, zip code, or dealer name;

(13)    establishing and maintaining authorized dealers in South Carolina for the sale of GM automobiles;

(14)    establishing and maintaining business relationships with automotive dealers in the State of South Carolina. For example, a website maintained by Autotrader shows that there are 52 Chevrolet and GMC dealers within a 50-mile radius of Charleston zip code 29401 that sell Chevrolet and GMC vehicles.[2] On information and belief GM makes millions of dollars in profits on an annual basis from its business relationships with South Carolina dealers. In addition, GM offers South Carolina dealers benefits, discounts, and/or incentives that the dealers would not otherwise have but for their relationships with GM as dealers. Further, GM sells parts and accessories in South Carolina primarily to authorized dealerships (which in turn sell these products to retail consumers) and to authorized parts distributors (which in turn primarily sell these products to retailers). (*See* GM's Form 10-K filing for the fiscal year ending December 31, 2019, p. 3). Thus, even if the South Carolina dealers are "independent" dealers, their business relationships with GM demonstrate an intentional and concerted effort by GM to target the State of South Carolina;

(15)    offering extended service contracts for vehicles purchased by South

---

[2] *See* https://www.autotrader.com/car-dealers/Charleston+SC-29401?zip=29401&searchRadius=50&makeCodeList=CHEV&makeCodeList=GMC&listingTypes=NEW&listingTypes=USED&listingTypes=CERTIFIED&sortBy=relevance&numRecords=25&firstRecord=0.

Carolina consumers;

(16)    training technicians to provide GM certified service at dealerships in South Carolina;

(17)    licensing or otherwise authorizing South Carolina dealers to use the GM Chevrolet name to market its vehicles. An example, the Rick Hendrick Chevrolet dealership[3] located in Charleston, South Carolina, is shown below:



The use of the GM Chevrolet name on the dealer's storefront also suggests that the dealer has a special relationship with GM or that the dealer is company owned;

(18)    making and/or purchasing retail installment sales contracts and other financing products through General Motors Financial Company, Inc. ("GM Financial") for new and used vehicles purchased by South Carolina consumers;

(19)    making wholesale loans to dealerships in South Carolina through GM Financial to

---

[3] *See* https://www.rickhendrickchevy.com/.

finance the purchase of vehicle inventory, otherwise known as floorplan financing;

(20)    obtaining authorization through the South Carolina Secretary of State to conduct business in the State of South Carolina and designating an agent in South Carolina for receipt of summonses and other forms of civil process.

23.    As demonstrated above, GM's contacts with South Carolina proximately result from actions *by GM itself* that create *a substantial connection* with South Carolina. GM established this substantial connection by *purposefully directing* its actions at the State of South Carolina and *purposefully availing itself* of the privilege of conducting activities or consummating transactions within South Carolina. Because GM's vehicles come into South Carolina as a result of a deliberate, even if indirect, effort of the Defendant to serve South Carolina's market, GM may be said to have purposefully availed itself of the protections of this State and is subject to jurisdiction here.

> ii.    **Plaintiff's injuries are related to GM's forum-related activities.**

24.    In light of its purposeful contacts, South Carolina has specific jurisdiction over GM because Plaintiff's claims are related to or arise out of GM's activities within or directed at South Carolina.

25.    Plaintiffs were injured by a defective GM motor vehicle of the type marketed and sold by GM in South Carolina. At all times relevant herein, GM expected or should have expected that its acts would have consequences within the United States, and in South Carolina in particular. At all relevant times, GM had knowledge that South Carolina residents could be injured by its defective vehicles.

26.    In summary, at all times relevant herein GM conducted substantial business in South Carolina, regularly caused its products to be sold in South Carolina, and Plaintiffs' claims arise out of injuries sustained through the use of a GM motor vehicle in South Carolina. Therefore,

personal jurisdiction is proper under South Carolina statutes, rules of civil procedure, and the Due Process Clauses of the Fifth and Fourteenth Amendments to the U.S. Constitution. Consequently, the exercise of personal jurisdiction over GM would be consistent with traditional notions of fair play and substantial justice.

### b.    Jurisdiction is reasonable

27.    Finally, jurisdiction over GM is reasonable when considering the following factors:

(1)    the burden on the defendant;

(2)    South Carolina's interest in resolving the dispute;

(3)    the Plaintiff's interest in receiving convenient and effective relief;

(4)    the interstate judicial system's interest in obtaining the most efficient resolution of the controversies;

(5)    the shared interest of the several states in furthering fundamental social policies.

28.    With respect to the first factor, the burden on GM is minimal given the relatively convenient nature of modern air travel between Michigan and South Carolina. Litigating in South Carolina is minimally more burdensome for GM, if at all, than litigating in Michigan. Moreover, it is likely that GM will be represented by Charleston-based counsel. Regarding the second and third factors, South Carolina has an interest in providing a forum for its injured citizens, and Plaintiffs have an interest in obtaining relief in their home state. Regarding the fourth factor, the interstate judicial system's interest in efficient resolution of controversies supports an exercise of jurisdiction in South Carolina because the case was first filed in South Carolina. Regarding the fifth factor, the shared interest of the several states in furthering fundamental social policies strongly support jurisdiction in South Carolina because this case is the only case currently pending

where the rights of all parties can be resolved in a single proceeding without the risk of inconsistent results and burdens on multiple courts. *See Holliday v. Nissan Motor Co., LTD.*, No. 2:18-1503-RMG, 2019 WL 2612771, at *4 (D. S.C. June 26, 2019) (providing similar analysis of the five factors).

**C.     Venue**

29.     Venue is proper within this District pursuant to 28 U.S.C. § 1391 because it is a judicial district where Defendant is subject to personal jurisdiction in accordance with 28 U.S.C. § 1391(c) and because material acts described herein occurred in South Carolina, including the infliction of Plaintiffs' injuries by the Subject 2007 Chevrolet Silverado that was introduced into the stream of commerce while the vehicle contained the defects described herein. Venue properly lies in the Charleston Division pursuant to Local Civ. Rule 3.01(A)(1) (D.S.C.), as it is the Division in which a substantial part of the events or omissions giving rise to the claim occurred.

**IV.**

**CONDITIONS PRECEDENT**

30.     All conditions precedent to the filing of this action and to the Plaintiffs' right to the relief sought have occurred, have been performed, or have been excused.

**V.**

**FACTS COMMON TO ALL COUNTS**

**A.     The cause and origin of the fire**

31.     On June 27, 2018, David Pendergast was driving a GM 2007 Chevrolet Silverado pickup truck, VIN No. 2GCEC13JX71579469, ("the Subject Vehicle") on Interstate 95 near Summerton, South Carolina, with his fiance, Alexandrina Atanassova, in the front passenger seat, and their daughter, S.P., buckled in a child car seat in the rear of the crew cab.

32.    As David proceeded down the highway, a fire started beneath the Subject Vehicle. The fire was seen by a passing motorist, who alerted David Pendergast, and David immediately stopped the vehicle on the side of the highway. Alexandrina and David then jumped out to rescue S.P. Flames were spreading out from the center of the undercarriage, in the area of the gas tank, to both sides of the truck between the cab and rear tires.

33.    By the time Alexandrina could open the door to the back seat where S.P. was seated, flames were engulfing the rear portion of the cab. Without hesitation, Alexandrina thrust her arms into the burning flames to unstrap S.P. from the car seat and pull her out of the vehicle. Despite Alexandrina's best efforts, S.P. suffered horrific burns to her face, back, left arm and legs. Alexandrina and David also received serious burns to their bodies during their efforts to rescue S.P. from the burning vehicle.

34.    The Clarendon County Fire Department was dispatched to the scene, found the Subject Vehicle fully engulfed in flames, and extinguished the fire. The Subject Vehicle is shown in Figure 1 and Figure 2 below.



*Figure 1*

35.    A landing zone was set up near the Incident scene to transport David's family to

the hospital by Life Flight helicopter. However, because of strong winds, S.P., Alexandrina, and David were transported by ground ambulance to a local hospital emergency room.

36.     After S.P. and her parents were stabilized in the emergency room, S.P., Alexandrina, and David were transported by ground ambulance to a burn center hospital in Augusta, Georgia where they were admitted the morning of June 28, 2018 for treatment.

### *S.P.'s injuries and medical treatment*

37.     The burn center diagnosed S.P. with 2nd and 3rd degree burns covering 25% of her total body surface area. S.P. suffered burns to her face, neck, left back/side, left arm and hand, and both legs and feet. S.P. was taken to the operating room for an emergency escharotomy to treat 3rd degree burns, and for debridement, skin grafts, and stem cell treatment over a period of several weeks.

38.     After her skin grafts were completed, S.P. followed up with regular visits at the burn center for treatment, including laser therapy to reduce the extent of scarring. S.P. continues to receive laser treatments and will require treatment for years to come to treat her burn scars. In order for the laser treatments to be effective, S.P. must avoid sunlight for two weeks after each laser treatment. As a result, S.P. will continue to have severe limitations on her ability to enjoy the outdoors and to socialize with others outside for many years into the future.

39.     In addition to laser treatments, S.P. has been prescribed pain medication to treat her chronic and severe pain. S.P. has also experienced chronic itching, which she still suffers from.

40.     Presently, S.P. has extensive burn scarring and will continue to have extensive burn scarring during her adolescent years and adult life. S.P. will sustain damages in the future from physical, psychological, and psychosocial causes. As a result, S.P will require medical treatment for scar management and scar revision in the future and will sustain damages in the future for

physical pain and mental suffering, disfigurement, loss of enjoyment of life, and physical impairment.

### *Alexandrina Atanassova's injuries and medical treatment*

41.    Alexandrina Atanassova suffered 2nd degree burns to both arms and her left leg. She was treated at the Augusta burn center, where, over a period of weeks, she underwent surgery for skin grafting with cadaver skin and for debridement under general anesthesia, as well as other medical treatment for scar management. Because of the traumatic and horrific experience she endured, Alexandrina has been treated for post traumatic stress disorder. She was also prescribed pain medication for chronic and severe pain.

### *David Pendergast's injuries and medical treatment*

42.    David Pendergast suffered 2nd degree burns to his left foot and was treated at the Augusta burn center where he underwent surgery for skin grafting with cadaver skin. He was also prescribed pain medication for chronic and severe pain.

**B.    The defective 2007 Chevrolet Silverado**

43.    The subject 2007 Chevrolet Silverado was designed and manufactured with an emission canister and component fuel lines, made of plastic, located on the front of the gas tank. The photos below in Figure 2 show the location of the emission canister and fuel lines in the Subject Vehicle and in an exemplar vehicle.



*Figure 2*

44.     The emission canister and component fuel lines were exposed and vulnerable to strikes from road debris when the Subject Vehicle was traveling on the highway. More likely than not—indeed, it is highly probable—that road debris striking the plastic fuel lines created a fuel leak. The gas spewing from the leak, hitting hot surfaces such as the catalytic converter, flashed into a fire that engulfed the truck.

45.     Defendant GM was aware of the vulnerability of the emission canister and plastic fuel lines, located in the front of the gas tank and unshielded. On information and belief, GM developed inhouse criteria for protecting gas tanks as early as the 1980s stating that road debris must be considered in the design. Despite this knowledge, GM failed to provide adequate protection to the fuel system and components.

46.     At all material times, GM was aware of feasible and reasonable alternative designs that would have protected the emission canister and plastic fuel lines from road debris strikes. GM could have provided a shield for the emissions canister and plastic fuel lines. As an example, the side shield on the gas tank shown in Figure 3 could have been extended to protect the emission

21

canister and plastic fuel lines at a nominal cost. Alternatively, GM could have located the emission canister and the plastic fuel lines in an area where they would not have been exposed to strikes from road debris, again at a nominal cost.

47.     There were no other sources of fire ignition other than the fuel system and its components.

## VI.

## CLAIMS FOR RELIEF

### A.    COUNT ONE – STRICT LIABILITY IN TORT

48.     Plaintiffs adopt and re-allege each prior paragraph, where relevant, as if set forth fully herein.

49.     At all relevant times relevant, there was in full force and effect certain statutes of the State of South Carolina pertaining to sellers of defective products as set forth in Section 15- 73-10 et seq. of the South Carolina Code of Laws (1976, as amended).

50.     Pursuant to S.C. Code § 15-73-10 et seq., Defendant GM is strictly liable in tort, irrespective of privity, for the design, testing, manufacturing, assembling, distributing, and sale of a defective and unreasonably dangerous product that GM placed into the stream of commerce. The elements of strict tort liability, as set out in Section 15-73-10, are as follows:

> (1)    One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm caused the ultimate user of consumer, or to his property, if:
>
> > (a)    The seller is engaged in the business of selling such a product, and
> >
> > (b)    It is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2)    The rule stated in subsection (1) shall apply although:

(a)    The seller has exercised all possible care in the preparation and sale of his product, and

(b)    The user or consumer has not bought the product from or entered into any contractual relation with the seller.

S.C. CODE ANN. § 15-73-10 (1976, as amended).

51.    At all times relevant herein, the Subject Vehicle and its systems and components, including its fuel system and components, were defective and unreasonably dangerous as to the design, manufacture, and warnings of each, causing the Subject Vehicle, including its fuel system and components, to be in a defective condition that made each unreasonably dangerous for its intended use.

52.    Defendant GM was responsible for the design, manufacture, and sale of the Subject Vehicle and its fuel system and components prior to the Incident on June 27, 2018.

53.    At all relevant times, including when the Incident occurred, the Subject Vehicle and its systems and components were used in an intended and/or foreseeable manner. Plaintiffs neither misused nor materially altered the Subject Vehicle. Upon information and belief, immediately prior to the Incident, the Subject Vehicle was in the same or substantially the same condition that it was in at the time it was sold by GM.

54.    The Subject Vehicle and its fuel system and components failed to perform in a manner reasonably expected in light of their nature and intended function.

55.    Additionally, the risks inherent in the design of the Subject Vehicle and its fuel system and components outweigh the utility of the products as designed.

56.    At all times relevant, the Subject Vehicle was unreasonably dangerous and defective because it was designed, manufactured, and sold with a fuel system and components that were unprotected from strikes from road debris that were foreseeable, including during the

Incident.

57.    Defendant GM manufactured, designed, assembled and placed the Subject Vehicle, a defective and unreasonably dangerous product, into the stream of commerce and failed to:

(a)    properly design, manufacture, and assemble the fuel system and components to safely and sufficiently resist the foreseeable impacts of road debris;

(b)    properly design, manufacture, and assemble the fuel system and components to safely and sufficiently prevent dangerous, unintended damage caused by road debris;

(c)    properly design, manufacture, and assemble the fuel system and components to prevent leaks caused by foreseeable impacts from road debris;

(d)    properly design, manufacture and assemble the Subject Vehicle in a manner to prevent damage to the fuel system and components from road debris;

(e)    adopt and implement adequate safety hierarchy procedures and policies in the design, manufacture, and distribution of the Subject Vehicle;

(f)    to incorporate safeguards into the design, manufacture, and distribution of the Subject Vehicle, including the fuel system and components; and

(g)    in such other and further particulars as the evidence may show.

58.    At all times relevant herein, GM was aware of feasible alternative designs which would have made the Subject Vehicle safer and minimized or eliminated altogether the risk of injury posed by the Subject Vehicle.

59.    At all times relevant, GM had a duty to warn users of the dangers associated with the Subject Vehicle, including the fuel system and components.

60.    At all times relevant, GM failed to warn of the inherent defects that made the

Subject Vehicle dangerous and unsafe for its intended use.

61.    As a direct, producing, and proximate cause of the defective condition of the Subject Vehicle and its fuel system and components, the fuel within the Subject Vehicle ignited on June 27, 2018.

62.    The ignition caused by the defective condition of the Subject Vehicle and its fuel system and components was the direct and proximate cause of the June 27, 2018 vehicle fire in South Carolina.

63.    The ignition caused by the defective condition of the Subject Vehicle and its fuel system and components directly and proximately caused each of the Plaintiffs to suffer serious injuries including:

    (a)    physical pain and mental suffering;

    (b)    disfigurement and scarring;

    (c)    physical impairment;

    (d)    loss of enjoyment of life;

    (e)    medical expenses; and

    (f)    other such injuries, damages, and particulars as the evidence may show.

64.    By reason of the foregoing, Plaintiffs are entitled to recover for all general and special damages proximately caused by the defective condition of the Subject Vehicle.

65.    WHEREFORE, Plaintiffs demand judgment against Defendant GM for all actual and compensatory, together with interest, if applicable, and all costs of this action and such other and further relief as this Honorable Court and/or jury may deem just and proper.

**B.    COUNT TWO - NEGLIGENCE**

66.    Plaintiffs adopt and re-allege each prior paragraph, where relevant, as if set forth

21

fully herein.

67.    Defendant GM had an active role in the design, manufacture, assembly, marketing, and distribution of the Subject Vehicle, including its fuel system and components.

68.    Defendant GM owed Plaintiffs a duty of reasonable care in the manufacture, design, assembly, and marketing of the Subject Vehicle and its fuel system and components so that the vehicle would provide a reasonable degree of occupant protection and safety during foreseeable strikes from road debris occurring in the real-world highway environment of its expected use.

69.    As designed, manufactured, assembled, marketed, and distributed, the Subject Vehicle, including its fuel system and components, was defective, unreasonably dangerous, and unsafe for foreseeable users and occupants because the vehicle was inadequately designed and constructed and failed to provide the degree of occupant protection and safety a reasonable consumer would expect during foreseeable strikes from road debris occurring in the real-world highway environment of its expected use

70.    At all relevant times, including when the Incident occurred, the Subject Vehicle, including its fuel system and components, was used in an intended and/or foreseeable manner.

71.    The Plaintiffs neither misused nor materially altered the Subject Vehicle and its fuel system and components, and immediately before the Incident, the Subject Vehicle and its fuel system and components were in the same or substantially similar condition that they were in at the time the vehicle was sold by GM.

72.    Additionally, the risks inherent in the design of the Subject Vehicle and its fuel system and components outweigh the utility of the products as designed.

73.    Defendant GM failed to exercise due care and was negligent in designing, manufacturing, assembling, and placing the Subject Vehicle, a defective and unreasonably

dangerous product, into the stream of commerce and breached its duties to Plaintiffs in:

(a)     failing to design, manufacture, test, and assemble the Subject Vehicle, including the fuel system and components, to safely and sufficiently resist the foreseeable impact of road debris;

(b)     failing to design, manufacture, test, and assemble the Subject Vehicle, including the fuel system and components, to safely and sufficiently prevent damage from road debris;

(c)     failing to design, manufacture, test, and assemble the Subject Vehicle, including the fuel system and components, to prevent leaks in the fuel system and components caused by foreseeable impacts from road debris;

(d)     failing to adopt and implement adequate safety hierarchy procedures and policies in the design, manufacture, testing, assembly, marketing, and distribution of the Subject Vehicle, including its fuel system and components;

(e)     failing to adopt and implement appropriate quality assurance procedures in the design, manufacture, testing, assembly, marketing, and distribution of the Subject Vehicle, including its fuel system and components;

(f)     failing to adopt and implement adequate warnings regarding the Subject Vehicle, including the fuel system and components;

(g)     failing to incorporate safeguards into the design, manufacture, testing, assembly, marketing, and distribution of the Subject Vehicle,

including the fuel system and components; and

(h)     in such other and further particulars as the evidence may show.

74.     The defective condition of the Subject Vehicle and its fuel system and components was the direct and proximate cause of the June 27, 2018 vehicle fire in South Carolina.

75.     As a direct and proximate cause of Defendant GM's negligence and breaches complained of herein, each of the Plaintiffs suffered serious and permanent injuries including the following:

(a)     physical pain and mental suffering;

(b)     disfigurement and scarring;

(c)     physical impairment;

(d)     loss of enjoyment of life;

(e)     medical expenses; and

(f)     other such injuries, damages, and particulars as the evidence may show.

76.     WHEREFORE, Plaintiffs demand judgment against Defendant GM for all actual and compensatory damages, together with interest, if applicable, and all costs of this action and such other and further relief as this Honorable Court and/or jury may deem just and proper.

**C.     <u>COUNT THREE - FAILURE TO WARN</u>**

77.     Plaintiffs adopt and re-allege each prior paragraph, where relevant, as if set forth fully herein.

78.     Defendant GM, which had an active role in the manufacture, design, and/or assembly of the Subject Vehicle and its fuel system and components, owed a duty to give adequate warnings of the dangers of which it knew or reasonably should have known could arise from the use of its respective products and components.

79.    Defendant GM had actual or constructive knowledge that the intended use of the Subject Vehicle created a danger for the ultimate consumer during the foreseeable and anticipated use of the product it sold.

80.    Defendant GM therefore had a duty to warn of the foreseeable dangers arising from the use of the Subject Vehicle to inform third persons of the facts which make the Subject Vehicle dangerous to users and consumers.

81.    Specifically,

(a)    GM knew or reasonably should have known that the design, manufacture, and assembly of the fuel system did not prevent dangerous, unintended damage caused by road debris;

(b)    GM knew or reasonably should have known that the design, manufacture, and assembly of the fuel system did not prevent leaks in the fuel lines caused by foreseeable impacts from road debris.

82.    GM breached its duty by failing to provide adequate warnings of the potential risks of the Subject Vehicle and by failing to adequately communicate those warnings to the ultimate consumer.

83.    GM's failure to warn of the dangers associated with the Subject Vehicle and its fuel system and components directly and proximately caused each of the Plaintiffs to suffer:

(a)    physical pain and mental suffering;

(b)    disfigurement and scarring;

(c)    physical impairment;

(d)    loss of enjoyment of life;

(e)    medical expenses; and

21

        (f)     other such injuries, damages, and particulars as the evidence may show.

84.     WHEREFORE, Plaintiffs demand judgment against Defendant GM for all actual and compensatory damages, together with interest, if applicable, and all costs of this action and such other and further relief as this Honorable Court and/or jury may deem just and proper.

## VII.

## <u>COMPENSATORY DAMAGES</u>

85.     Plaintiffs adopt and re-allege each prior paragraph, where relevant, as if set forth fully herein.

86.     As a direct and proximate result of GM's conduct, more particularly described above, Plaintiffs suffered and incurred, and will continue to suffer and incur, the following injuries and damages, among others:

        a.     Medical and health care expenses in the past;

        b.     Medical and health care expenses in the future;

        c.     Pain and suffering in the past;

        d.     Pain and suffering in the future;

        e.     Physical impairment in the past;

        f.     Physical impairment in the future;

        g.     Disfigurement in the past;

        h.     Disfigurement in the future;

        i.     Lost wages/loss of earning capacity in the past;

        j.     Loss of earning capacity in the future;

        k.     Loss of enjoyment of life in the past;

        l.     Loss of enjoyment of life in the future;

     m.    Attorney's Fees (where recoverable) and Costs; and

     n.    Other damages.

87.    Plaintiffs would show that their damages, injuries and/or losses are within the jurisdictional limits of this Court, and include the above damages, and any other consequential damages foreseeably arising from the Incident.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully pray that Defendant General Motors LLC be cited to appear and answer herein, and that upon trial, Plaintiffs have judgment against Defendant for the following:

1.    compensatory damages in excess of the minimum jurisdictional limits of the Court;

2.    costs of this suit;

3.    attorneys' fees, where applicable;

4.    pre-judgment interest in accordance with South Carolina law;

5.    post-judgment interest in accordance with South Carolina law; and

6.    such other and further relief as this Court may deem proper and just.

Respectfully submitted,

**MCWHIRTER, BELLINGER & ASSOCIATES, P.A.**
**s/Melissa Garcia Mosier, 11000**
Melissa G. Mosier
South Carolina Bar Number 78693
Federal ID Number 11000
119 E. Main Street
Lexington, South Carolina 29072
Telephone: 803-359-5523
Facsimile: 803-996-9080
E-mail: melissam@mcwhirterlaw.com


Bradley L. Leger
(*South Carolina Federal Bar Admission pending*)
Texas Bar Number 24039899
Federal ID Number
bleger@lkclawfirm.com

Rodney K. Castille
(*South Carolina Federal Bar Admission pending*)
Texas Bar No. 03984300
Federal Bar No. 8282
rcastille@lkclawfirm.com
10077 Grogan's Mill Road, Suite 325
The Woodlands, Texas 77380
Telephone: 832-764-7200
Facsimile: 832-764-7211


**ATTORNEYS FOR PLAINTIFFS**